**REMAND/JS-6**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-4181-GW(FFMx) | Date | August 13, 2015 |
|---|---|---|---|

| Title | *The People of the State of California v. Wells Fargo and Company, et al.* |
|---|---|

---

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jeremy Barzon | E. Martin Estrada |
| Jessica B. Brown | Manuel F. Cachan |
| Suzanne V. Spillane | Kyle Casazza |

**PROCEEDINGS:**    **PLAINTIFF'S MOTION TO REMAND [13]**

The Court's Tentative Ruling is circulated and attached hereto.  Court hears oral argument.  Based on the Tentative, and for reasons stated on the record, Plaintiff's Motion to Remand is GRANTED and the above-entitled action is remanded to the Los Angeles County Superior Court (BC580778).

|  | : | 20 |
|---|---|---|
| Initials of Preparer | JG | |

*The People of the State of California v. Wells Fargo & Co. et al.*, Case No. CV-15-4181-GW(FFM); Tentative Ruling on Plaintiff's Motion to Remand

## I. Background

The People of the State of California (the "People" or "Plaintiff") filed this suit against Wells Fargo & Company and Wells Fargo Bank, National Association ("Wells Fargo Bank") (collectively, "Wells Fargo" or "Defendants"), alleging unfair competition claims arising from Wells Fargo's purported unethical and illegal sales tactics. This civil law enforcement action is brought by the Criminal Branch of the Los Angeles City Attorney's Office on behalf of the People. *See* Complaint ("Compl."), Docket No. 1-1, ¶ 2.

Wells Fargo & Company operates the fourth largest bank in the United States and is the largest bank headquartered in California. *Id.* ¶ 3. Wells Fargo Bank, a subsidiary of Wells Fargo & Company, provides most of the banking products and services that form the basis of the People's claims. *Id.*

Wells Fargo, as part of its sales and growth goals, seeks to increase the average number of products held by its customers from six to eight bank accounts or financial products per account holder – a goal Wells Fargo terms the "Gr-eight" initiative. *Id.* ¶ 4. The products-per-customer and cross-sell strategies, as well as the goal of eight products per household, are detailed in Wells Fargo's 2014 Annual Report to the U.S. Securities and Exchange Commission. *Id.* ¶ 21-22. The People allege that Wells Fargo's resulting market dominance has been achieved through unrelenting pressure on its bankers and a strictly enforced quota system for its sales employees, who engage in allegedly abusive and fraudulent tactics to achieve their mandated goals. *Id.* ¶¶ 5, 23-24. The People allege that daily sales for each branch and employee are reported four times a day, and employees who fail to meet quotas are often reprimanded and admonished to "do whatever it takes" to meet their sales quotas. *Id.* ¶ 5. The People further allege that the quotas are often unattainable via traditional means because there aren't enough customers that pass through a branch on a daily basis. *Id.* ¶ 25.

As a consequence, the People allege, Wells Fargo's branch managers and employees have engaged in practices known as "gaming," which include opening and manipulating accounts in deceptive ways, such as omitting signatures or adding additional accounts without customer permission. *Id.* ¶¶ 5, 28. The People further allege that certain gaming practices have

1

become so pervasive at Wells Fargo that they have been given their own names. *Id.* ¶ 28. "Bundling" refers to the practice of incorrectly informing customers that certain products are available only in packages with other products or accounts, known as a "packed" account, while in fact each product is available on its own. *Id.* ¶¶ 7, 29. In many instances employees are instructed to lie to customers and tell them that each checking account automatically comes with a savings account, credit card, or other products including life insurance and "ExpressSend"[1] (described as "an online program that allows customers to send money to foreign countries."). *Id.* ¶ 29. When customers discover an unauthorized account, they are often informed that the account or product came with the authorized accounts automatically. *Id.* ¶ 30. In the case of unauthorized credit cards, customers are advised simply to destroy the card they received, but doing so does not close the credit card account. *Id.* ¶ 31. "Pinning" refers to the practice of having employees personally assign Personal Identification Numbers (often 0000) to customer ATM cards without customer authorization. *Id.* ¶¶ 7, 32. In doing so, employees can then impersonate customers on Wells Fargo's system and enroll those customers in online banking and online bill pay without consent, oftentimes also inputting false generic email addresses in order to complete the transaction. *Id.* ¶ 32. "Sandbagging" refers to Wells Fargo employees' practice of delaying the execution of customer requests to open new accounts until the next sales reporting period, after which additional unauthorized accounts are opened as well as the requested accounts. *Id.* ¶ 7, 33. The People allege that Wells Fargo engages in other gaming tactics, including making misrepresentations to encourage customers to open additional accounts, misrepresenting that additional accounts are fee-free, and targeting "individuals holding Mexican Matriculada Consular cards because the lack of a social Security Number makes it easier to open numerous fraudulent accounts." *Id.* ¶ 36. The People allege that Wells Fargo knew or should have known about its employees opening unauthorized accounts and, despite this knowledge, Wells Fargo did little, if anything, to stop the "gaming" practices. *Id.* ¶¶ 41-42.

The People allege that Wells Fargo's gaming practices have caused significant harm to customers, in the form of stress, hardship, and financial losses. *Id.* ¶ 6. Specifically, customers have had to pay monthly service fees for unauthorized accounts, customer accounts are placed into collection, customers' credit reports are affected, and customers are forced to purchase

---

[1] Plaintiff refers to that product as "Express Send" (*see* Compl. at § 29), whereas Wells Fargo indicates that the name is one word, *i.e.* "ExpressSend." *See* Declaration of Daniel Ayala at ¶ 6, Docket No. 17-1. Given that it is the Defendants' product, the Court will use Wells Fargo's denomination.

identity theft protection services to prevent further fraudulent activities. *Id.* ¶ 38.

The People assert two causes of action against Wells Fargo for violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq. Id.* ¶¶ 54-61. First, they allege that Wells Fargo violated the UCL by engaging in "gaming" practices, including making misrepresentations, misappropriating customer information, committing fraud, and accessing and taking private customer information without permission. Second, the People allege that Wells Fargo violated the UCL by failing to provide customers with notice of any data breach or misuse of their customer information. The People ask for injunctive relief preventing Wells Fargo from engaging in the alleged practices, restitution of interest in any money or property acquired by means of the alleged unlawful practices, civil penalties, and costs. *Id.* at 19:1-6.

The People filed the present suit in Los Angeles Superior Court on May 4, 2015. *See* Notice of Removal, Docket No. 1, ¶ 1. Wells Fargo subsequently removed the case to this court, contending that the Court has subject matter jurisdiction under the Edge Act and under 28 U.S.C. § 1331. *See generally id.* The People now move to remand the case to state court, arguing that the Court does not have jurisdiction over this suit. *See generally* "Plaintiff, the People of the State of California's . . . Motion to Remand" ("Mot."), Docket No. 14.

## II. Legal Standard

Federal courts are courts of limited jurisdiction, and the party asserting jurisdiction has the burden of establishing that jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Amer.*, 511 U.S. 375, 377 (1994); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988). A defendant may remove to federal court any action over which the court has original jurisdiction. 28 U.S.C. § 1441(a). The Ninth Circuit applies a "strong presumption" against removal jurisdiction, and strictly construes the removal statute against removal jurisdiction. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). It has been observed, however, "that, when the Edge Act is invoked as the basis for removal, the federal court should be cautious about remand, lest it erroneously deprive defendant of the right to a federal forum." *Jana Master Fund, Ltd. v. JP Morgan Chase & Co.*, 490 F.Supp.2d 325, 329 (S.D.N.Y. 2007) (internal quotation marks omitted).

## III. Analysis

The Edge Act, 12 U.S.C. §§ 601 *et seq.*, provides federal district courts with original

jurisdiction over certain suits that involve international banking. It was enacted in 1919 "for the purpose of supporting U.S. foreign trade, in part by authorizing the establishment of international banking and financial corporations." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 778 (2d Cir. 2013) ("*AIG II*"). It provides, in pertinent part:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law.

12 U.S.C. § 632. Thus, the Edge Act permits removal to federal court of (1) a civil suit, (2) where one of the parties is a corporation organized under the laws of the United States, and (3) the suit arises out of transactions involving international or foreign banking or other international or foreign financial operations. *See Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014). The international or foreign banking transactions must be made by the corporation or its agencies. *AIG II*, 712 F.3d at 784.

The People's primary argument is that the Edge Act does not apply because their claims do not arise out of "transactions involving international or foreign banking."[2] *See generally* Mot. In support of their argument, the People asserts that no foreign party is involved, the Complaint does not allege any actual foreign "transaction" that was made, the purported foreign transactions do not form the basis of the People's claims, and finding federal jurisdiction in this case would conflict with congressional intent. *Id.* at 4:1-12:24. In response, Wells Fargo argues that the claims do arise out of international banking transactions because they are premised in part on the opening of ExppressSend accounts that enable consumers to send money abroad, and the

---

[2] The People also contend that, because the Edge Act does not apply, federal question jurisdiction under 28 U.S.C. § 1331 is not present, and accordingly, the case should be remanded. Mot. at 12:25-13:27.

restitution claim would involve return of ExpressSend fees. *See* Defendants' Opposition to Plaintiff's Motion to Remand ("Opp'n"), Docket No. 17, at 5:21-9:20.

No party contests that the current action is a civil suit at law or in equity that involves a corporation organized under the laws of the United States. The case is a civil enforcement action that involves claims for violation of state unfair competition laws. Wells Fargo Bank is a national bank chartered pursuant to the provisions of the National Bank Act. The issue in dispute is whether the suit arises out of transactions involving international or foreign banking or other international or foreign financial operations.

In its Notice of Removal, Wells Fargo identifies two allegations in the Complaint that it asserts support finding that the case arises out of international banking transactions. First, it points to paragraph 29 of the Complaint, which involves allegations of "bundling." Notice of Removal ¶ 2. Specifically, the Complaint alleges that in order to ensure that every checking account was sold together with multiple other products or accounts, Wells Fargo employees are "instructed by management to lie to customers by telling them that each checking account automatically comes with a savings account, credit card, or other product such as life insurance, and/or 'Express Send' (an online program that allows customers to send money to foreign countries)."[3] Compl. ¶ 29. Wells Fargo contends that because "bundling" involves sale of the ExpressSend product, and because the Complaint seeks restitution for fees or money Wells Fargo earned as a result of the alleged illegal practices, the claims necessarily arise out of transactions involving international or foreign banking. Opp'n at 5:21-7:22. Second, Wells Fargo notes that the Complaint alleges that Wells Fargo employees opening fraudulent accounts would target "individuals holding Mexican Matriculada Consular Cards" who do not possess Social Security numbers. Notice of Removal ¶ 2. As to the second allegation, the targeting of Mexican consular cardholders, the Court fails to see the relevance of this fact to determining whether the Complaint arises out of international or foreign banking transactions. Simply opening an account in the name of someone who is a non-citizen or who does not possess a Social Security number does not necessarily involve a foreign transaction. The allegation involving "bundling" ExpressSend accounts, however, presents a much closer question.

The Complaint alleges that Wells Fargo employees lied to customers and "bundled"

---

[3] The Court notes that ExpressSend is only mentioned once in the 19-page Complaint and, even then, only as an example of a "bundled" product. *See* Compl. at ¶ 29.

products, including ExpressSend, in order to meet sales quotas. The People do not deny that the ExpressSend product involves sending money to foreign countries. *See* Compl. at ¶ 29. In and of itself, the act of making an ExpressSend transfer would likely qualify as a foreign banking transaction. However, the Complaint does not allege that Wells Fargo employees caused customers to use the ExpressSend product; it only asserts that Wells Fargo employees would tell customers that opening a checking account would "automatically" come with other accounts and/or enroll customers in other services, including ExpressSend, without their express and knowing permission. *Id.* Therefore, the primary question that arises in this case is how "related" must a foreign banking transaction need to be to the claims at issue in order for the suit to be held to "arise out of" that transaction or set of transactions.

The People contend that the Complaint does not on its face allege "an actual, or even tangential, international banking transaction," and the Complaint does not aver that any such transactions took place. Mot. at 8:24-25. Instead, the People argue, the focus of the claims is on the alleged misrepresentations made and fraud committed by Wells Fargo employees; any subsequent ExpressSend transfers that might thereafter have been made are irrelevant to the People's claims, and are not in fact charged in the Complaint. *Id.* at 8:25-9:3. The People argue that because no ExpressSend transfers were alleged in the Complaint, and furthermore because the claims, as they relate to the practice of bundling, "arise out of" Wells Fargo's alleged misrepresentations and not out of any subsequent or consequential ExpressSend transfers, the Edge Act does not apply. Wells Fargo counters that the allegations in the Complaint regarding ExpressSend are sufficient to establish jurisdiction under the Edge Act because the restitution sought in the Complaint would necessarily include restitution for any fees or money Wells Fargo received from ExpressSend transfers.[4] Opp'n at 5:23-9:20.

---

[4] Wells Fargo presumes that the Complaint seeks "the restitution of bank fees 'arising out of transactions involving international or foreign banking' – an international funds transfer service called ExpressSend." *See* Opp'n at 1:12-14. However, the Complaint does not ask for such specific relief; rather it merely seeks in relevant part: "[p]ursuant to Business and Professions Code sections 17203 and 17204, Defendants be ordered to restore to all persons in interest any money or property they acquired by means of the unlawful, unfair, and fraudulent business acts and practices [alleged] in this Complaint." *See* ¶ 2 of Prayer for Relief in the Complaint.

As noted above, in regards to the ExpressSend product, the unlawful, unfair and fraudulent business act/practice consists only of the improper bundling of that product with an authorized banking service such as a checking account. The Complaint does not allege that any subsequent use of the ExpressSend service would be unfair or fraudulent. Moreover, the Complaint does not reference any specific bank fees that are generated by the use of ExpressSend. However, assuming arguendo that such fees are incurred, there is no allegation in the Complaint that customers are misled as to the existence and/or amount of those bank fees, that such fees are not normally charged in the banking industry for those type of services, or that Wells Fargo's fees are higher than the

Here, upon consideration of the specific allegations in the Complaint, the Court concludes that the inclusion of ExpressSend in the Complaint does not result in the conferral of federal jurisdiction under the Edge Act to this case. The Court agrees with the People that any ExpressSend transactions that were made would be irrelevant to determining whether Wells Fargo is liable under the unfair competition claims asserted in the Complaint. The Complaint concerns alleged illegal activity such as misrepresentations, fraud, identity theft, and computer data breaches. In particular, Wells Fargo's liability arises from the establishment of the Express-Send product without the customer's informed and knowing consent, and not from any use of the product itself. Indeed, if in fact present at all, liability would arise immediately once the account is created and prior to any later use of the service. Indeed, liability would have already accrued even if there were no actual use of the ExpressSend product. The main thrust of the claims do not concern any subsequent transactions made by consumers from alleged unauthorized accounts.

Furthermore, the Complaint does not allege that any ExpressSend transactions were made at all. Although Wells Fargo argues that the fact that the People seek restitution supports the contention that the claims "arise out of" ExpressSend transactions (*but see* footnote 4, *supra*), this does not mean that any ExpressSend transactions or fees are central or even material to finding liability in this case. Wells Fargo's argument could be equally applied to a situation where ExpressSend is not involved but a customer made any sort of international wire transfer from an add-on account Wells Fargo employees had opened for that customer via the practice of "bundling." In neither case is the actual transfer relevant to the issue of liability for the People's unfair competition claims; rather, it is the actions of Wells Fargo employees in making misrepresentations or fraudulently opening new accounts that make up the issues in this suit. The "bundling" allegations do not "arise out of" the transfer of money abroad through ExpressSend; rather, they arise out of the alleged misrepresentations Wells Fargo employees made to customers in informing them, essentially, that opening a checking account also required opening

---

normal charges for that service. Thus, the *use* of ExpressSend by a customer would not by itself appear to give rise to money or property acquired by means of an unlawful or fraudulent business act or practice. While the Complaint does not aver that in the bundling process, the customer is told that a desired product (such as a checking account) "can be obtained only with the purchase of additional accounts or products, when, in fact, the desired product is available on its own," the money acquired improperly in that instance is the additional sum paid for the unwanted product (such as ExpressSend), which is *not* a fee arising from an international or foreign banking transaction but, rather, is simply money charged for the sale of the additional product itself.

other accounts and/or signing up for other products – one of which was ExpressSend. *See generally Allstate Ins. Co. v. Citimortgage, Inc.,* Case No. 11-Civ-1927(RJS), 2012 WL 967582 *3 (S.D.N.Y. March 13, 2012) ("the Edge Act does not confer jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties . . . . Instead, courts must carefully examine the nature of the transaction said to ground § 632 jurisdiction. [citations omitted]").

Although courts are split on how to interpret the "arising out of" language in the Edge Act, the present case is more analogous to those where no jurisdiction has been found than those where courts have found the case in question to arise out of international or foreign banking. There is a paucity of case law in the Ninth Circuit regarding Edge Act jurisdiction in general, and courts in other jurisdictions – particularly in the Second Circuit – disagree on what degree of relatedness is necessary in order to find that a suit "arises out of" a foreign banking transactions or activity. The People, citing to *Weiss v. Hager*, a Southern District of New York case, argue that the international connection in this case is merely incidental. *See* Mot. at 6:25-7:13; *Weiss v. Hager*, Case No. 11 CV 2740 VB, 2011 WL 6425542, at *3-4 (S.D.N.Y. Dec. 19, 2011) (finding no Edge Act jurisdiction where the foreign banking transactions were "incidental" to the claims at issue and were not "legally significant"). *See also Bank of New York v. Bank of Am.*, 861 F. Supp. 225, 233 (S.D.N.Y. 1994) (interpreting the Edge Act to mean that the banking aspect of the transaction must be "legally significant" and holding that there was no Edge Act jurisdiction in a breach of contract case that "present[ed] no banking law issues"). Wells Fargo contends that, in fact, courts in the Southern District of New York commonly hold that "[a] suit satisfies the jurisdictional requisites of Section 632 if any part of it arises out of transactions involving international or foreign banking . . . even if that involvement is merely incidental" *Dexia SA/NV v. Bear, Stearns & Co.*, 924 F.Supp.2d 555, 558 (S.D.N.Y. 2013) (citing *In re Lloyd's Am. Trust Fund Litig.*, 928 F.Supp. 333, 338 (S.D.N.Y. 1996); *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 820 F.Supp.2d 555, 557 (S.D.N.Y. 2011) ("*AIG I*")) (internal quotation marks omitted). Although Wells Fargo argues that the "legally significant" requirement adopted in *Weiss* and *Bank of New York*, has been "roundly criticized as inconsistent with the language of the Edge Act," the cases Wells Fargo cites in support of its argument actually pre-date *Weiss* (though they do come after *Bank of New York*). *See* Mot. at 12:2-19; *In re Lloyd's.*, 928 F.Supp. at 340-41 (S.D.N.Y.1996); *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 627

F.Supp.2d 730, 736 (N.D. Tex. 2008).[5]  The primary cases Wells Fargo references, *Dexia* and *AIG I*, both involve mortgage-backed securities of which some small number of the underlying mortgages loans involved offshore properties.  This case is more analogous to *Weiss*, which involved allegations that defendants had conspired to defraud the plaintiff by convincing him to invest in a fabricated overseas securities trading program and thereby defrauding plaintiff of his purported investment money.  *Weiss*, 2011 WL 6425542, at *1-2.  The court in *Weiss* held that, in contrast to cases where the foreign banking activities were essential to the legal analysis, the

---

[5] However, as noted in *Ritchie Capital Management, LLC v. JPMorgan Chase & Co.*, 532 B.R. 461, 468-69 (S.D.N.Y. 2014):

> The only point of disagreement among the parties has also divided the courts in this district: whether the foreign transactions are implicated to such an extent that the case can be said to "arise out of" those transactions. Plaintiffs contend that for Edge Act jurisdiction to exist the transactions must be central to the claim. *See, e.g., Weiss v. Hager*, No. 11 Civ. 2740, 2011 U.S. Dist. LEXIS 150402 2011 WL 6425542, at *3 (S.D.N.Y. Dec. 19, 2011) (Edge Act jurisdiction does not exist where international banking transactions are "incidental"); *Bank of N.Y. v. Bank of Am.*, 861 F. Supp. 225, 233 (S.D.N.Y. 1994). Defendants counter that Edge Act jurisdiction is appropriate "if any part of" the transactions at issue implicates international or foreign banking. *See In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333, 338 (S.D.N.Y. 1996).

> Most, if not all, of the cases that the parties reference in their Edge Act arguments predate the Second Circuit's recent decision in *AIG II*, 712 F.3d 775 (2013), which controls the disposition here. In that case, AIG and its subsidiaries brought suit in state court against, among others, Bank of America Corporation, a federally chartered bank, for fraudulent misrepresentations in underwriting, sponsoring or selling residential mortgage-backed securities. *AIG II*, 712 F.3d at 778. "A tiny percentage of the mortgages" were secured by real property in the United States territories of Guam and Puerto Rico. *Id.* In the district court, AIG argued that the connection to territorial or foreign banking was too attenuated because AIG challenged only the residential mortgage-backed securities and not the underlying mortgage transactions involving territorial properties. *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 820 F. Supp. 2d 555, 557 (S.D.N.Y. 2011) ("*AIG I*"). The district court denied the motion for remand and held that the mere "presence of the territorial mortgages," however "incidental" to foreign or territorial banking, allowed it to exercise jurisdiction. *Id.* Further, the court concluded that "Edge Act jurisdiction lies even if the foreign or territorial transactions comprise only a 'small portion' of the challenged transactions." *Id.* (quoting *Pinto v. Bank One Corp.*, No. 02 Civ. 8477, 2003 U.S. Dist. LEXIS 9348, 2003 WL 21297300, at *3 (S.D.N.Y. June 4, 2003)). Finally, the district court was "not convinced that the Edge Act requires a perfect match between the particular entity involved in the territorial transaction and the party against whom the claim is brought." *Id.* at 558.

> On appeal, the Second Circuit vacated the district court's judgment solely on the final ground. It held that, for Edge Act jurisdiction to exist, "the suit must arise out of an offshore banking or financial transaction of [a] federally chartered corporation" that is party to the suit. *AIG II*, 712 F.3d at 784. The court did not express any disagreement with the lower court's conclusion that the minimal territorial nexus to offshore transactions was sufficient to confer Edge Act jurisdiction; the court apparently was not concerned that the territorial nexus was based on a "tiny percentage" of mortgages at issue, or that property securing the mortgages that backed the securities, and not the securities themselves, was "territorial." To the contrary, the court wrote of "the necessary transaction" to establish Edge Act jurisdiction and the requirement "of an offshore transaction." *Id.* at 783-84. (emphases added). In sum, the Second Circuit required the district court to reconsider its Edge Act ruling in only one way – by requiring that the federally chartered bank that is party to the suit to undertake the necessary international or foreign transactions.

9

banking activities in *Weiss* were not legally significant and were not indispensable to the case. *Id.* at *3-4. Just as the plaintiff in *Weiss* was challenging the fraud and conversion by defendants rather than the overseas transfers themselves, the People in this case are challenging the misrepresentations made by Wells Fargo in "bundling" products to sell to customers. The connection of the claims at issue to foreign transactions is even more tenuous in the present case than in *Weiss*, as in this case the People do not allege that any foreign transfers were made via illegally opened ExpressSend accounts. In fact, the court in *AIG I* stated that *Weiss* was not necessarily incompatible with its holding. *AIG I*, 820 F.Supp.2d at 557 ("The cases Plaintiffs cite, which deal with the presence of a 'banking law issue' and not the relative size of the foreign/territorial component, are not to the contrary.). Similarly, in *Dexia*, the court held that "the process of engaging in the territorial mortgage transactions is sufficiently central to the plaintiffs' claims to find that the case 'aris[es] out of' those transactions." *Dexia*, 924 F.Supp.2d at 558. Thus, a threshold question in *Dexia*, *AIG I*, and *Weiss* was whether the foreign trans-actions were "sufficiently central" to the claims brought by the plaintiff or whether they were merely "incidental." In the present case, the Court concludes that the purported transactions are clearly incidental to the claims; accordingly, the Edge Act does not confer jurisdiction.

Wells Fargo argues that there is no *de minimus* exception to Edge Act jurisdiction, and therefore the Edge Act applies even if the ExpressSend transactions were minimal. Opp'n at 14:11-15:12. However, holding that there is Edge Act jurisdiction in cases where only a small percentage of the total transactions in question are international is different from holding that there is Edge Act jurisdiction when the foreign transaction is completely incidental to the claims at issue. In the first instance, even though the foreign transactions represent a small fraction of the total, the primary claims in the case may directly concern banking activity. In the second instance, the transactions could involve a large sum of money, but the transactions themselves might not be "legally significant" – in other words, they are irrelevant to the substance of the actual claims. *See Ritchie Capital Mgmt., L.L.C. v. JPMorgan Chase & Co.*, 532 B.R. 461, 469 (S.D.N.Y. 2014) (distinguishing *Weiss* and *Bank of New York* from *In re Lloyd's* because the former two cases were simply contractual disputes or involved no banking law issues whereas the latter case involved "a wide-ranging challenge to multiple . . . operations of a complex of . . . bank accounts" (citing and quoting *In re Lloyd's*, 928 F.Supp. at 340). Although the Ninth Circuit has held that the Edge Act "provides a broad grant of jurisdiction," *City & Cnty. of San*

*Francisco v. Assessment Appeals Bd. for City & Cnty. of San Francisco, No. 1*, 122 F.3d 1274, 1276 (9th Cir. 1997), to uniformly resolve questions over what the Second Circuit has termed the "ambiguous" language of the Edge Act in favor of presumed federal jurisdiction would lead to absurd results. *AIG II*, 712 F.3d at 780; *see also Sollitt v. KeyCorp*, 463 F. App'x 471, 473 (6th Cir. 2012) (refusing to subscribe to the "inherently limitless view" that the Edge Act confers jurisdiction if "any part of" the suit "arises out of transactions involving international or foreign banking" (citing and quoting *Pinto v. Bank One Corp.*, 2003 WL 21297300, at *3 (S.D.N.Y. June 4, 2003)).

The People also argue that there is no jurisdiction under the Edge Act because no foreign party is alleged in the Complaint, finding jurisdiction would conflict with Congressional intent, and the fact that this suit was a *parens patriae*, or state law enforcement, action brought in the public interest militates against removal. Mot. at 9:24-10:8, 12:14-15:12. Because the Court finds that the allegations involving ExpressSend are insufficient to conclude that the suit "arises out of" international or foreign transactions, it need not address the remainder of the People's arguments. However, the Court notes as an aside that the Plaintiff's arguments concerning foreign parties and state law enforcement actions are unavailing. The Edge Act does not require that a foreign party be alleged in the Complaint; it merely requires that the suit arise out of foreign banking transactions or activities of a nationally chartered corporation who is a party to the suit. *See* 12 U.S.C. § 632; *City of Stockton v. Bank of Am., N.A.*, No. C-08-4060 MMC, 2008 WL 5063877, at *2 n.3 (N.D. Cal. Nov. 21, 2008) ("several courts have found jurisdiction under § 632 proper in an action against a domestic entity arising from a transaction involving international or foreign banking, and in which the foreign entity was not named as a party") (citing cases). Furthermore, the People cite no cases, and the Court can find none, that hold that the Edge Act does not apply to *parens patriae* or state law enforcement actions.

**IV. Conclusion**

The Edge Act does not confer jurisdiction over this suit. Because Wells Fargo's rationale for removal under 28 U.S.C. § 1331 relies on the jurisdictional grant of the Edge Act, the Court likewise does not have federal question jurisdiction over this suit. For the reasons stated herein, the Court would GRANT the motion to remand and remand this case to Los Angeles Superior Court.